IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN RAO | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| TEXAS PARKS AND WILDLIFE | § | |
| DEPARTMENT | § | |
|     Defendant | § | JURY DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

John Rao, Plaintiff, files this Original Complaint, complaining of the Texas Parks and Wildlife Department, and for his cause of action, respectfully shows the following:

## I.
## INTRODUCTION

1. This action seeks equitable relief, actual damages, compensatory damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for unlawful retaliation suffered by Plaintiff in the course of his employment with the Defendant.

2. Plaintiff's cause of action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

3. Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

4. Plaintiff, John Rao, is a resident of the State of Texas.

5.     Defendant Texas Parks and Wildlife Department may be served with process through its Executive Director, Carter Smith, at 4200 Smith School Road, Austin, Texas 78744.

6.     Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

### III.
### JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 since Plaintiff is bringing this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  The Court has personal jurisdiction over Defendant since it maintains sufficient minimum contacts with the State of Texas.

2

8.      Venue is proper in the Southern District of Texas, under 28 U.S.C. § 1391(b) since the events or omissions giving rise to this cause of action occurred in the Southern District of Texas.

9.      This Court has jurisdiction over all claims in this action.

**IV.**
**PROCEDURAL REQUISITES**

10.     On or about June 22, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division asserting unlawful retaliation pursuant to the Texas Labor Code and Title VII.

11.     On or about May 11, 2017, the Department of Justice issued Plaintiff his Notice of Right to Sue.

12.     This lawsuit has been filed within (90) days of Plaintiff's receipt of the Notice of Right to Sue letter.

13.     All conditions precedent to filing this cause of action have been met.

## V.
## FACTS

14.    John Rao began working as a game warden for The Texas Parks and Wildlife Department ("TPWD") in 1990.

15.    In his position as a game warden, Rao was a commissioned peace officer for the State of Texas.

16.    Historically, the TPWD has demonstrated a pattern of discriminating against African-Americans in its employment practices.

17.    For example, while TPWD has been a state agency for approximately 50 years, during that time, only 1% of the Game Wardens hired have been African-American.

18.    During their employment, other non African-American game wardens have noticed the pattern of unlawful discrimination occurring against the African-American employees.

19.    For example, John Rao, a Caucasian Game Warden, commented to his former captain, Albert Lynch, about how he noticed the improper treatment of African-American Game Wardens by TPWD.

4

20.    Rao was advised by his former Captain, Albert Lynch, to distance himself from Kelly Newman, and not to work with him anymore because he is African-American.

21.    Rao protested Captain Lynch's advice and explained to Captain Lynch that he did not mind working with Warden Newman.

22.    Warden Rao chose to work with Warden Newman during his employment.

23.    Rao also assisted Newman with his Charge and provided him with information regarding the procedures for filing a Charge, as well as evidence to support his Charge.

24.    Once TPWD learned that Rao had assisted Newman with filing his Charge with the EEOC, TPWD retaliated against Rao for assisting him.

25.    As a result, Warden Rao subsequently filed a Charge of Discrimination with the Equal Employment Opportunity Commission against the TPWD.

26.    Since the time Rao filed his Charge of Discrimination in 2007, Rao was subjected to additional retaliation by TPWD.

27.    For example, since the time Rao filed his Charge of Discrimination in 2007, he was repeatedly denied promotions for which he was eminently qualified, and for which he was clearly the best qualified applicant.

28.    Regarding one of the positions, Rao was told by the Assistant Chief that Rao had not done anything wrong in the interview, but Rao "had filed that complaint."

29.    At the time of that conversation, Kelly Newman was riding with Rao and heard the conversation between Rao and the Assistant Chief.

30.    On September 16, 2010, Rao filed a Charge of Discrimination alleging retaliation against TPWD.

31.    On August 19, 2011, while Rao's Charge of Discrimination was still pending at the EEOC, Captain Nick Harmon, who acted as Interim Captain for the Harris County District after Albert Lynch resigned, held a district meeting.

32.    During this meeting, Captain Harmon boldly stated that the other districts call the Game Wardens in Rao's district "malcontents" and "complainers."

33.    Mr. Harmon also said that going forward, anyone who complains, "Austin will have paperwork ready for your release."

34.     On September 1, 2011, Rao applied for the Captain Position in Harris County, which was formerly held by Albert Lynch.

35.     Rao interviewed for the Captain position along with nine other candidates.

36.     Notably, Major Skeen, who had been the subject of Rao's 2007 Charge of Discrimination, was a panelist on the interview panel for the Captain Position.

37.     Rao was denied the promotion to Captain.

38.     Instead, Fred Ruiz was selected for the promotion to Captain.

39.     On September 1, 2012, Rao was assigned to report to Waller County at 6:00 a.m. for the opening of dove hunting season.

40.     Rao joined Captain Ruiz and four other game wardens to cover the opening of dove hunting season.

41.     With the exception of John Rao, all of the game wardens were issued All-Terrain Vehicles ("ATVs") to use.

42.     Rao was instructed to patrol the fields on foot, even though everyone else was allowed to patrol the fields on the ATVs.

43.    When Mr. Rao asked Captain Ruiz if he could double up on an ATV with another warden, Ruiz' response was to say, "No.  You're going to walk."

44.    Rao later learned from game wardens at the Galveston Law Enforcement Office that Captain Ruiz had been bragging about his retaliation against Rao by telling the game wardens in that office how he made Rao walk the dove fields.

45.    On November 30, 2012, Rao took the TPWD Game Warden Physical Readiness Coordinator ("PRT") test.

46.    After Rao successfully completed the sit up portion of the test, Captain Ruiz claimed that Rao needed to retake the sit up portion of the exam.

47.    Captain Ruiz demanded that the trained coordinators who administered the test, and who had approved Rao's sit up test, needed to change Rao's score.

48.    On January 17, 2013, Rao met with Major Skeen and Captain Ruiz.

49.    During this meeting, Mr. Rao was called a "cancer" in the Department and a "troublemaker."

50.    Rao was repeatedly threatened with losing his job and was informed that his next evaluation would not be a good one.

8

51.     During this meeting, Mr. Rao was also told if he does not like his job, he should leave and go find a job with the Houston Zoo or HPD.

52.     During this meeting, Rao was also told that his ticket numbers do not reflect the amount of hours he worked.

53.     That allegation was false.

54.     In March 2013, Rao filed a lawsuit against TPWD in the Southern District of Texas, Civil Action No. 4:13-cv-00729 *John Rao v. Texas Parks and Wildlife Department;* in The United States District Court for the Southern District of Texas, Houston Division.

55.     Following the filing of Rao's suit, TPWD began retaliating against him, as well as Warden Kelly Newman, who was named as a witness in his suit.

56.     For example, on July 6, 2013, approximately 2-3 months after TPWD was served with Warden Rao's lawsuit in which Newman was named as a witness, an incident occurred with respect to which Newman and Rao were falsely accused of improper conduct and dereliction of duties regarding an alleged boating while intoxicated incident.

57.    On July 6, 2013, Newman was partnered with Warden Rao while they were taking part in a Water Saturation Patrol event on Clear Lake.

58.    Warden Rao was driving the boat, and Newman was riding with him.

59.    While leaving the dock, Newman noticed that a vessel, which was docked with a number of people loading and unloading different items on the boat, did not have a current registration.

60.    Newman instructed Warden Rao to turn their vessel around so Newman could run the registration and issue a citation if necessary.

61.    Warden Newman and Warden approached the vessel, and as they approached, Newman asked who was in charge of the boat since it was docked and nobody was behind the controls at that time.

62.    An individual, whose initials are M.S., claimed that he was the party responsible for the boat.

63.    Because it was a windy day, creating choppy water conditions, Warden Rao could not simply pull up next to the other boat because there was a possibility that

due to the conditions he could damage either the state vehicle he was operating or the other boat.

64. Therefore, Warden Rao pulled up to the landing next to the boat ramp. Newman then indicated to M.S. that he should walk down the pier toward the ramp where it was less choppy so that they could better have a conversation.

65. Both Newman and Rao observed M.S. as he walked the length of the pier.

66. M.S. had no trouble walking the length of the pier, and he did not appear to be impaired during his walk.

67. M.S. then boarded the front of Newman's vessel.

68. Newman personally observed that M.S. had no issues stepping onto their vessel.

69. Newman then spoke to M.S.

70. M.S. did not smell of alcohol and did not slur his speech.

71. Newman then issued a citation for M.S. for the expired registration, since M.S. had indicated that he was responsible for the boat.

72.    Newman had no reason to believe that M.S. was impaired at the time Newman conducted the inspection and spoke with M.S.

73.    Therefore, Newman did not request a field sobriety test or a blood alcohol test of M.S.

74.    One month after Rao and Newman testified in their depositions, in October 2013, Captain Ruiz issued Rao and Newman a write up regarding his citation to M.S.

75.    In the write-up, Captain Ruiz claimed that at the time Newman issued the citation to M.S. for the expired registration, M.S. was intoxicated.

76.    Captain Ruiz also claimed that Newman and Rao were at fault and failed to properly perform their duties for his failure to identify and respond appropriately to M.S. operating a boat while intoxicated at the time Newman issued M.S. the citation.

77.    Captain Ruiz' claim was based on the fact that approximately 30 minutes after M.S. was cited by Newman, M.S. was pulled over by other Game Wardens and was arrested for Boating While Intoxicated.

78.   The write up issued to Rao by Captain Ruiz contained numerous falsehoods about the alleged boating while intoxicated incident involving M.S. in an attempt to wrongfully attack his performance.

79.   Contrary to Captain Ruiz' assertion in the write up, no one was operating the vessel when Newman and Rao approached M.S.' vessel.

80.   Rather, M.S.' boat was docked at the time Newman and Rao approached M.S.' vessel.

81.   Additionally, the write up states that M.S. was pulled over by the second set of Game Wardens ten minutes after the initial stop.

82.   That statement was also false.

83.   Rather, the time difference between stops was anywhere from 23 minutes to one hour based on the various reports and citations created.

84.   Heat, wave action and wind all affect blood alcohol levels, just as an individual's height, weight, whether the individual had an empty or full stomach, and how rapidly the individual consumed the alcohol are all factors that will vary the blood alcohol level of a person drinking alcohol.

13

85.     Captain Ruiz also stated in the write up that M.S. must have been over a .080 blood alcohol level when Newman issued the citation to him.

86.     That statement is also false.

87.     Rao contested the validity of the write up given to him by Captain Ruiz since he had done nothing wrong with respect to the M.S. citation.

88.     Captain Ruiz can articulate nothing improper that Rao and Newman did regarding their interaction with M.S.

89.     Rao's case went to trial in June 2014.

90.     Rao was off work during the majority of the fiscal 2013-2014 year on Workers' Compensation disability leave.  However, when Rao received his 2014 evaluation in mid-2014 shortly after he returned to work on light duty, he was negatively rated for alleged job performance issues, even though as a practical matter, Rao's supervisor could not have evaluated his job performance given that he had not been at work at his regular duties at the time of the evaluation, nor would he have been able to evaluate Rao's job performance while he was off on medical leave.

14

91.   The negative rating was unsubstantiated and a retaliatory action.

92.   On August 22, 2014, Rao was informed by Captain Ruiz that Major Skeen stated that Rao could no longer use his state assigned vehicle (with Toll Tag) or his state gas card and would be required to use his own personal vehicle, and pay for his own gas and toll tag in violation of TPWD Policy OP-01-01, State Vehicles.

93.   No other Game Wardens were required to use their own vehicle and pay for their own gas and tolls without any reimbursement.

94.   As a result of being required to use his own vehicle, and pay for gas and toll tags, Rao accrued approximately $642.00 in expenses and 1500 miles on his vehicle.

95.   Captain Ruiz also told Rao that he would not be allowed to claim work hours for commuting to and from work away from his headquarters, which is game warden's place of residence and which Rao had been doing before his medical leave.

96.   Other Game Wardens remained able to claim work hours for commuting to and from work.

97.   On July 30, 2014, Captain Ruiz ordered Rao to Light Duty after requiring that Rao's doctor release him to return to work.

98.    According to TPWD Policy Transitional Duty Policy HR-04-01 and Law Enforcement General Orders Limited Duty Policy 14.130, Captain Ruiz was required to provide a "Bona Fide Job Offer" for Rao's light duty assignment when Rao returned to work.  Rao requested from Captain Ruiz a "Bona Fide Job Offer" from the department several times in August 2014.

99.    However, Rao was not given the "Bona Fide Job Offer" until he had been back working on light duty for about a month and a half.  On September 11, 2014, Rao was finally given a "Bona Fide Job Offer" that stated that after 60 days of Limited Duty, if Rao could not return back to full duty, Rao's options would be to (1) request reasonable accommodations, (2) take appropriate leave, or (3) resign according to TPWD Policy Transitional Duty Policy HR-04-01.  According to the document, the 60 days was retroactive to the start of the return to work date.

100.   On about September 30, 2014, after Rao's 60 days of limited duty was exhausted and he was not able to return to full duty without restrictions, Rao requested to go on his earned sick leave for further treatment in accordance with TPWD Policy Transitional Duty Policy HR-04-01.

16

101.   At that time, Rao was off workers compensation insurance and was being treated under his personal health insurance.

102.   Rao was still being treated by his physician for his injury and his physician did not want Rao to return to work until his condition improved.   Captain Ruiz responded that Rao would only be allowed to use his earned sick leave if Rao provided him with a signed a medical consent form.

103.   On October 1, 2014, TPWD gave Rao a medical consent form that he was required to sign.

104.   Rao signed the medical consent form TPWD required him to sign.

105.   The medical consent form was not an official TPWD form authorized for use.

106.   The medical consent form from Captain Ruiz was created specifically for Rao.

107.   The form contained a list of questions, including non-medical questions that a physician should not be expected to answer, and was not likely that the physician could even complete.

108.   TPWD  told Rao that this was a single use form and it was sent to his primary care physician.

17

109.   On December 10, 2014, Rao was contacted by the office of his spine surgeon, Dr. Santos, and was told that HR Specialist Rebecca Gonzales had sent them the same medical consent form, which they would not be completing.

110.   Not only had the form been altered and the date changed without Rao's authorization, instead of indicating that the form was being sent by "Texas Parks & Wildlife Department" the cover letter stated that the form was being sent from the "Texas Workforce Commission."

111.   Dr. Santos was not providing medical treatment for the injuries listed in the Workers' Compensation claim.

112.   Because of concerns with the altered form, the reference to the Workers' Compensation claim, and HIPAA guidelines, Dr. Santos refused to complete the unoffical form, even after being contacted by TPWD's attorney, who called and demanded the completion of the form.

113.   It was clear that TPWD was harassing Rao because of his previous protected activity, including his lawsuit, which went to trial in June 2014.

114.   Due to the harassment to which he was being subjected, Rao resigned from his position with TPWD in March 2015.

115.   At the time of his retirement, Rao had approximately one year's worth of sick time on the books.

116.   Other Game Wardens who have put in for retirement were previously allowed to be on paid medical leave to use up all their sick time before their formal retirement date.

117.   Not only did those other Game Wardens receive their full salary during that time, but they were also credited with the additional time in their pension benefit payments.

118.   Rao was told that it would be a "hardship" on the department to have to his position be unfilled during that time.

## VI.
## CAUSE OF ACTION—RETALIATION

119.   Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

120.  As described above, as a result of Rao's opposition to unlawful employment practices, including his suit against TPWD, Rao has been retaliated against by TPWD, and constructively terminated from his position, in violation of Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq.*, and the Texas Labor Code.

121.  As a result of Defendant's unlawful retaliation, Rao has incurred damages.

## VII.
## ATTORNEY'S FEES

122.  Each and every allegation contained in the foregoing paragraphs are re-alleged as if fully rewritten herein.

123.  Plaintiff is entitled to recover attorney's fees and costs for bringing this action pursuant to 42 U.S.C. § 1988.

## VIII.
## JURY DEMAND

124.  Plaintiff requests a trial by jury on all issues triable by a jury in this case.

20

## IX.
## RELIEF REQUESTED

125.   Plaintiff requests the following relief:

a.   For actual damages for the period of time provided by law including appropriate backpay and reimbursement for lost pension, insurance, and all other benefits;

b.   For reinstatement, or front pay in lieu of reinstatement;

c.   For compensatory damages as allowed by law;

d.   For pre-judgment and post-judgment interest as allowed by law;

e.   For attorney's fees, expert witness fees and costs of court; and

f.   For such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted,

AHMAD & CAPODICE, PLLC

By: /s/ Nasim Ahmad
Nasim Ahmad
State Bar No. 24014186
24900 Pitkin, Suite 300
The Woodlands, Texas  77386
Telephone:  (832) 767-3207
Telecopier:  (281) 864-4379

ATTORNEYS FOR PLAINTIFF
JOHN RAO